CGI Technologies and Solutions, Inc., Petitioner/Plaintiff,

against
New York State Office of Mental Health, Ann Marie T. Sullivan, MD, in her capacity as Commissioner of the New York State Office of Mental Health, and Christopher Tavella, PhD, in his capacity as Executive Deputy Commissioner of the New York State Office of Mental Health and the State of New York, Respondents/Defendants.


903156-19

Hodgson Russ LLP
Attorneys for Petitioner/Plaintiff
(Christopher Massaroni, of counsel)
677 Broadway, Suite 301
Albany, New York 12207
McDermott Will & Emery LLP
Attorneys for Petitioner/Plaintiff (pro hac vice)
(Margaret H. Warner, Lisa M. Richman and Theodore E. Alexander, of counsel)
500 North Capitol Street NW
Washington DC 20001
Letitia James, Attorney General
Attorney for Respondents/Defendants
(Richard C. Maider, Cornelia E. Mogor and Adrienne J. Kerwin, of counsel)
The Capitol
Albany, New York 12224


Richard M. Platkin, J.

This is a hybrid CPLR article 78 proceeding/action for declaratory and equitable relief commenced by petitioner/plaintiff CGI Technologies and Solutions, Inc. ("CGI" or "plaintiff") against respondents/defendants New York State Office of Mental Health ("OMH") and senior agency officials (collectively, "defendants").
CGI moves for a preliminary injunction (i) restraining defendants from continuing to use the proprietary software and intellectual property created by CGI pursuant to a contract with the State of New York ("State") until it is paid in full; (ii) restraining defendants from altering, modifying or allowing third parties to access CGI's software and intellectual property; and (iii) compelling defendants to return CGI's software and other intellectual property (see NYSCEF Doc No. 76 ["Notice of Motion"]). Defendants oppose the motion.
BACKGROUND
A. The Contract
CGI is an information technology consulting company. OMH is a State agency that operates about two dozen mental-health facilities and oversees hundreds of private outpatient facilities.
CGI was the successful bidder on a Request for Proposal issued by OMH for the procurement of a new electronic medical records ("EMR") system (see NYSCEF Doc No. 5). Following extensive negotiations concerning the scope and cost of the project ("Project"), the parties signed a contract on August 27, 2013 (see NYSCEF Doc No. 8 ["Contract"]). The contract price was in excess of $51 million, and the initial term of the agreement was four (4) years (see id.). CGI hired two principal subcontractors to assist with the Project, one of which was Document Storage Systems, Inc. ("DSS").
Although OMH originally sought to procure an off-the-shelf software solution, the agency ultimately required, and CGI developed, a highly-customized system tailored to OMH's unique needs (see NYSCEF Doc No. 1 ["Complaint"], ¶ 6). For this reason, the Contract addresses the ownership and use of any "Custom Work" developed by CGI for the Project (see Contract, Appendix D-1, § F [3]).
Custom Work "shall be deemed to be a work made for hire . . . and shall belong exclusively to OMH, with OMH having the sole right to obtain, hold and renew in its name, all copyrights or other appropriate protection upon payment in full for such Custom Work or portion thereof" (id. [emphasis added]). "To the extent that any such Custom Work may not be deemed to be a work made for hire, [CGI] agrees and hereby irrevocably assigns to OMH all, right, title and interest in the Custom Work . . . upon payment in full for such Custom Work (or portion thereof)" (id. [emphasis added]).
The first phase of the Project required CGI to develop and implement EMR software for OMH's direct care facilities. CGI allegedly completed this phase of the Project by October 2017, and OMH has been using the EMR software in its facilities since then (see Complaint, ¶¶ 7, 27). While claiming to have fulfilled its obligations under the Contract, CGI alleges that "OMH failed to live up to its end of the bargain" (id., ¶ 8; see NYSCEF Doc No. 78 ["Claim"], ¶¶ 45-78 [detailing allegations of OMH-caused delays and interference with the contracted work]).
On April 25, 2018, after repeated efforts to reach agreement with OMH regarding the extra costs allegedly encountered in performing the contracted work,"CGI submitted an agreed upon Change Request extending the scope and cost of the [P]roject" (Complaint, ¶ 8). "Instead [*2]of approving the Change Request, on May 18, 2018, OMH suddenly suspended all contract activities. At the time, OMH claimed this suspension was intended as a 'pause,' and assured CGI the [P]roject would restart" (id.). Believing this representation, CGI allegedly "complied with OMH's requests, including OMH's requests that CGI provide access to [its] critical intellectual property during this 'pause'" (id.).
OMH denied CGI's claims for additional compensation on August 6, 2018 and terminated the Contract for convenience on the same date (see id., ¶ 9; NYSCEF Doc Nos. 16, 17). CGI contends that "OMH's refusal to pay for the services provided and false promises of a 'pause' were ruses contrived by [the agency] to take improper possession of CGI's intellectual property and work product without having to pay for them as required under the Contract" (Complaint, ¶ 9). At present, OMH is said to be in possession of the only copy of the source code for the EMR system, including the "Custom Work" that CGI claims to own by reason of OMH's failure to make "payment in full" (Contract, Appendix D-1, § F [3]; see Complaint, ¶¶ 47-50; Claim, ¶¶ 108-120).
OMH allegedly continues to use, modify and provide third parties with access to the EMR system and software in which CGI claims ownership rights (see Complaint, ¶ 10). In particular, the Complaint alleges that OMH has granted certain third parties access to CGI's intellectual property in order to maintain and improve the EMR system (see id., ¶¶ 57-59).
B. The Litigation
On January 31, 2019, CGI filed a claim in the New York State Court of Claims seeking monetary damages and declaratory relief arising from OMH's alleged breaches of the Contract (see Claim). In opposing CGI's application for preliminary injunctive relief therein, the State argued that the Court of Claims lacked subject matter jurisdiction over CGI's claim for declaratory relief, which was said to be the predicate for the requested preliminary injunction. In a Decision & Order dated May 8, 2019, the Court of Claims (DeBow, J.) accepted the State's argument and held that it lacked jurisdiction to issue a declaration of rights concerning ownership of the Custom Work (see NYSCEF Doc No. 81, p. 5).
CGI thereafter commenced this action in Supreme Court, alleging three causes of action. The first cause of action seeks a declaration of rights to the Custom Work pursuant to CPLR 3001, together with an injunction restraining defendants from continuing to use, modify or provide third parties with access to such software (see Complaint, ¶¶ 62-73). The second and third causes of action seeks similar relief under CPLR article 78 (see id., ¶¶ 74-82).
Defendants moved to dismiss CGI's Complaint in lieu of answering. During the pendency of this motion practice, the Court of Claims decided the State's pre-answer motion to dismiss eight of ten claims alleged by CGI, including the cause of action for conversion. In a Decision & Order dated July 18, 2019 (see NYSCEF Doc No. 82), the Court of Claims dismissed seven of the eight challenged claims, but it declined to dismiss the conversion claim, explaining:
The terms of the contract indicate that CGI intended to retain ownership of its intellectual property until OMH had paid CGI in full, and CGI sufficiently alleges that it provided custom work to OMH, that OMH exercised dominion over CGI's intellectual property by downloading and using it without having paid fully, and that OMH has cut off CGI's access to its own intellectual property (p. 12).
In a Decision & Order dated August 28, 2019 (see NYSCEF Doc No. 74 ["Prior MTD Decision"]), this Court granted defendants' motion to dismiss to the limited extent of dismissing the two causes of action brought pursuant to CPLR article 78. In sustaining the first cause of action for declaratory and injunctive relief, the Court opined, among other things, that "CGI has stated a legitimate claim to ownership of the intellectual property at issue herein" (id., p. 9).
DISCUSSION
The party seeking the drastic remedy of preliminary injunction must demonstrate "a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of equities in its favor" (Nobu Next Door, LLC v Fine Arts Hous., Inc., 4 NY3d 839, 840 [2005]; see CPLR 6301; Rick J. Jarvis Assoc. v Stotler, 216 AD2d 649, 650 [3d Dept 1995]). The Court will consider each of these elements in turn.
A. Likelihood of Success
1. CGI's Contentions
In arguing that it has demonstrated a reasonable likelihood of success on the merits, CGI relies principally on language in the Contract providing that "title to CGI's custom work only passes from CGI to OMH upon OMH's payment in full for the custom work" (NYSCEF Doc No. 93 ["MOL"], p. 12). According to CGI, OMH has admitted to not fully paying for work that CGI performed under the Contract, yet OMH continues to use CGI's intellectual property and distribute it to third parties, in contravention of the express terms of the Contract.
Section F of Appendix D-1 to the Contract ("Section F"), entitled "Software Licenses," governs the licensing and ownership of the software ("Software") used in the EMR system developed by CGI under the Contract ("System"). It begins with a broad declaration that all Software "may be used by OMH in perpetuity without the payment of on-going license fees." Section F then goes on to make specific provision for the licensing and ownership of "proprietary" software and "custom" software.[FN1]

To the extent that the System includes or relies upon proprietary software owned or licensed by CGI ("Proprietary Software"), CGI "grants OMH a fully paid-up, non-exclusive, perpetual, royalty-free license to use, execute [or] reproduce" the software "for government purposes upon payment in full for the corresponding Deliverable(s), or portion thereof" (Section F [2]).[FN2]
The same provisions govern any work derived from Proprietary Software ("Proprietary Derivatives") (see id.).
Custom software developed by CGI for the Project other than Proprietary Software or Proprietary Derivatives ("Custom Work") "shall be deemed to be a work made for hire . . . and shall belong exclusively to OMH, with OMH having the sole right to obtain, hold and renew in its name, all copyrights or other appropriate protection upon payment in full for such Custom Work or portion thereof" (Section F [3] [emphasis added]). "To the extent that any such Custom Work may not be deemed to be a work made for hire, [CGI] agrees and hereby irrevocably [*3]assigns to OMH all, right, title and interest in the Custom Work . . . upon payment in full for such Custom Work (or portion thereof)" (id. [emphasis added]).
Section F further provides that "Custom Work shall be the property of OMH," and "OMH may use any such Custom Work for any OMH purpose" (Section F [3] [c]). CGI may not incorporate Custom Work into software distributed to third parties without OMH's permission, but "[t]he parties agree to evaluate value sharing opportunities related to Custom Work that may be sellable to other potential customers of [CGI]" (id. [3]).
In addition to proof of foregoing contractual terms conditioning OMH's ownership of Custom Work upon "payment in full," CGI submits evidence that OMH has refused to make certain payments allegedly due to it under the Contract. CGI claims that OMH improperly is withholding almost $3.2 million for the 10% surety holdback, about $2.64 million for work accepted by OMH prior to the suspension, almost $7 million for work in progress at the time of the suspension, and another $641,087 in termination and wind-down costs (see NYSCEF Doc Nos. 20, 78; see also Doc No. 117 ["Murray Aff."], ¶¶ 12-50). CGI also claims that it is owed more than $21 million in additional compensation for Project delays caused by OMH (see id.), notwithstanding a two-year, no-cost extension to the Contract that was executed by the parties in mid 2017 (see NYSCEF Doc No. 10).
Finally, CGI submits proof that OMH is: (a) using the System, which includes CGI's Custom Work; (b) altering the System through maintenance, updates and upgrades; and (c) providing third parties with access to the System in connection with the foregoing activities.
2. Analysis
As this Court recognized in denying OMH's pre-answer motion to dismiss, "CGI has stated a legitimate claim to ownership of the intellectual property at issue herein" due to OMH's alleged failure to "pay in full" all sums due under the Contract (Prior MTD Decision, p. 9). But this does not mean that CGI is likely to succeed in establishing that it is the owner of all of the Software or even all of the Custom Work.
In defining "Custom Work," the Contract refers to the "customized software" developed by CGI (Section F [3]). As CGI acknowledges, however, some portions of the Software and other intellectual property belong solely to DSS and other portions belong jointly to DSS and CGI (see NYSCEF Doc No. 92 ["Second Reagan Aff."], ¶ 7). Although CGI outlines in general terms the types of intellectual property that are the subject of its motion — including (1) custom integrations with other numerous software applications used by OMH, (2) custom code for report generation and (3) artifacts [FN3]
relating to the EMR system (see NYSCEF Doc No. 148 ["Third Titus Aff."], ¶ 2) — plaintiff's written submissions do not particularize the source code packages, artifacts and other intellectual property in which CGI claims exclusive ownership. Nor has CGI offered any clear means by which OMH personnel could identify the particular code and other intellectual property that is said to be owned solely by CGI (see NYSCEF Doc No. 107 ["Engel Aff."], ¶¶ 56, 59).
And while CGI recognizes that certain portions of the Software belong to DSS, either in [*4]whole or in part, CGI does not attribute any ownership interest to OMH. Throughout its moving papers, CGI attempts to treat ownership of the Custom Work as an all-or-nothing proposition: OMH acquires title to all of the Custom Work upon payment in full under the Contract, and CGI owns all of the Custom Work unless and until payment in full is made. However, this argument disregards the payment arrangements prescribed in the Contract and the corresponding language of Section F relating to ownership and licensing of Custom Work.
Under the Contract, CGI was obliged to furnish OMH with 56 performance-based "Deliverables," which are "products to be delivered to the OMH by [CGI] to fulfill the terms of [the C]ontract" (SOW, p. 5; see Engel Aff., ¶¶ 8-9), and OMH was obliged to pay CGI "[f]or each accepted Deliverable . . ." (Contract, p. 26; see also Murray Aff., ¶¶ 5, 8). Consistent with this arrangement, Section F provides that custom source code developed for the Project by CGI "shall be deemed to be a work made for hire . . . and shall belong exclusively to OMH, with OMH having the sole right to . . . all copyrights . . . upon payment in full for such Custom Work or portion thereof" (Section F [3] [emphasis added]).[FN4]

It is undisputed that OMH paid more than $34 million to CGI pursuant to the Contract (see Murray Aff., ¶ 50; Engel Aff., ¶ 31). These payments were made for Deliverables that were accepted by OMH on the basis of CGI's attestation that the delivered products were "complete" (Murray Aff., ¶ 8). The present record does not, however, provide any basis to determine which "portion[s]" of the Custom Work claimed by CGI were components of completed, accepted Deliverables for which CGI was paid (Section F [3]).[FN5]

Moreover, certain of the amounts claimed by CGI do not relate to any particular Custom Work. For example, it seems doubtful that the language of Section F (3) was intended to deny OMH ownership of a Deliverable for which CGI was paid in full due to a dispute as to whether CGI's wind-down costs are compensable in a termination for convenience (see Murray Aff., ¶¶ 37-39; Engel Aff., ¶ 33).
Finally, inasmuch as the contractual term "Custom Work" is defined by reference to "source code" (Section F [3]), the applicability of the Section F to "artifacts" has not been clearly established.
In any event, even if CGI had established that legal title to a particular Custom Work has not yet passed to OMH pursuant to the terms of Section F, there has not been a convincing showing that the Contract allows CGI to deny OMH the use of the System while the parties' contractual and fiscal disputes are being litigated in court.
Section F begins with a broad declaration that all of the Software developed by CGI for the Project "may be used by OMH in perpetuity without the payment of on-going license fees" [*5](Section F). The portion of Section F addressing Custom Work goes on to declare, without qualification, that "OMH may use [the] Custom Work for any OMH purpose" (id., [3] [c]). Thus, regardless of CGI's claim to ownership of some or all of the Custom Work, there is nothing in the Contract evincing a clear intention to deny OMH the status of a contractual licensee during the pendency of litigation regarding the parties' rights and obligations under the Contract.
Finally, in light of the uncertainties concerning which portions of the Custom Work presently are owned by CGI, the Court does not see any reasonable basis upon which it can grant an injunction compelling OMH "to return to CGI any and all of CGI's intellectual property" (Notice of Motion, p. 2).
Based on the foregoing, the Court finds that CGI has failed to demonstrate a sufficient likelihood of success as to warrant the requested preliminary injunctive relief.
B. Irreparable Harm
The second, and perhaps the most critical, element necessary to obtain a preliminary injunction is proof of irreparable harm (see Nobu Next Door, 4 NY3d at 840). In this context, irreparable harm means an injury for which a monetary award alone cannot be adequate compensation (see Town of Liberty Volunteer Ambulance Corp. v Catskill Regional Med. Ctr., 30 AD3d 739, 730 [3d Dept 2006]). Further, the movant must show that the claimed irreparable harm is more than just a mere possibility and, in fact, is imminent and likely to occur absent issuance of the requested injunction (see Golden v Steam Heat, 216 AD2d 440, 442 [2d Dept 1995]; see also American Commerce Ins. Co. v Francois, 125 AD3d 903, 903 [2d Dept 2016] ["imminent and nonspeculative harm"]).
For the reasons that follow, the Court finds that CGI has failed to sufficiently demonstrate the prospect of imminent and irreparable harm absent the requested injunction. The Court further finds that a preliminary injunction that restrains OMH from continuing to use or maintain the EMR System is likely to harm OMH and the patients who receive care and treatment in OMH facilities.
Initially, CGI's moving papers fail to articulate how CGI would be irreparably harmed by OMH's continued use of the EMR System during the pendency of the Court of Claims litigation. An eventual award of damages to CGI on its contractual cause of action, together with pre-award interest, would provide full compensation to CGI for its work under the Contract, including development of the Custom Work and artifacts. Given that CGI possesses an adequate remedy at law for OMH's continued use of the EMR System, it would be inappropriate to restrain OMH from using the Custom Work for governmental purposes (see Kaloyeros v Fort Schuyler Mgt. Corp., 157 AD3d 1152, 1154 [3d Dept 2018]; Town of Liberty Volunteer Ambulance Corp. v Catskill Regional Med. Ctr., 30 AD3d 739, 740 [3d Dept 2006]).
The second branch of CGI's motion seeks to restrain OMH "from altering, modifying or providing access to CGI's Intellectual Property to third parties" (Notice of Motion, p. 2). Although CGI's moving papers suffice to demonstrate the possibility of irreparable harm arising from third-party access to the Software, CGI's proof falls well short of demonstrating that such harm is imminent and likely. In particular, CGI has not established that its intellectual property is likely to be lost to business competitors by reason of OMH allowing DSS, CGI's former subcontractor/partner on the Project, and Adam Carboni, a former CGI developer who now works for OMH, to access and alter the Custom Work for purposes of keeping the System up and [*6]running (cf. Invesco Inst. [N.A.], Inc. v Deutsche Inv. Mgt. Ams., Inc., 74 AD3d 696, 697 [1st Dept 2010]).
Initially, OMH asserts, without contradiction, that it "is not now, nor does it plan to sell or transfer to third parties any portion of the OMH EMR" (Engel Aff., ¶ 62). "OMH is only using the system internally within its facilities and central offices" (id.).
As to DSS, the record shows that it was involved in the Project since at least 2013 as CGI's "contracted partner"(NYSCEF Doc No. 80 ["Second Titus Aff."], ¶ 9; see also id., ¶¶ 7-8; Engel Aff., ¶ 12). Moreover, CGI acknowledges that portions of the source code and other intellectual property comprising the System belong solely to DSS, including the base VistA software, and other portions are jointly owned by CGI and DSS (see Second Reagan Aff., ¶ 7). And as part of CGI and DSS's long-term collaborative "partner[ship]" on the Project (Second Titus Aff., ¶ 9), DSS had access to the Custom Work and other intellectual property claimed by CGI. For all of these reasons, the Court is unpersuaded that CGI is likely to suffer irreparable harm as a result of DSS's continued access to the Custom Work in connection with maintaining the Software and System as a contractor to OMH.
Additionally, while CGI now considers DSS to be a "competitor" (NYSCEF Doc No. 80 ["First Titus Aff."], ¶ 24), there is little in the way of evidence to support that characterization. Nor is there a non-speculative basis to find that CGI has lost, or is likely to lose, business opportunities to DSS. This is true even if the Court assumes that CGI is entitled to commercialize the Custom Work on a unilateral basis under the circumstances presented here (but see Section F [3] [c] ["(CGI) shall not incorporate any such Custom Work into its software for distribution to third parties unless the OMH . . . grants (CGI) permission . . . . The parties agree to evaluate value sharing opportunities related to Custom Work that may be sellable to other potential customers of (CGI) or its subcontractors."]).
Nor does the Court see irreparable harm arising from OMH's decision to contract with DSS to properly maintain the Software (see Engel Aff., ¶ 71). Given the termination of the Contract and the contentious litigation between CGI and OMH, there is no reasonable prospect that CGI can or would perform this work.
As to Adam Carboni, the record shows that he had access to the EMR System and its Software as a CGI employee from 2013 until 2018, so it is unclear how his continued access to the Custom Work poses an imminent risk of irreparable harm to CGI. Nor is there any evidence that Carboni's current work in maintaining OMH's legacy system, Mental Health Automated Record System ("MHARS"), would harm CGI (see NYSCEF Doc No. 123, ¶ 5 ["MHARS is distinct from the VistA EMR system that was the subject of (the Contract) between OMH and CGI. The (new) EMR system was intended to replace MHARS, however it was not fully completed and only partially implemented."]). Finally, CGI's allegations concerning Carboni's contractual obligations under his employment agreement (see Second Reagan Aff., ¶ 8) have no bearing on the propriety of the injunctive relief requested against OMH.
In contrast to the speculative and vague allegations of harm tendered by CGI, the Court sees a real risk of imminent and irreparable harm to OMH and its patients if the agency were enjoined from using the Custom Work during the pendency of the Court of Claims litigation. "The Custom Work CGI prepared and incorporated into the EMR system is integral to [the [*7]System's] functioning" (First Titus Aff., ¶ 9).[FN6]
OMH uses the integrations claimed by CGI to interface with software applications that, among other things, ensure the safe use of prescription medications (see Engel Aff., ¶¶ 44, 46),[FN7]
allow prescriptions to be filled electronically, as required by New York State law (see id., ¶ 45), facilitate regulatory compliance (see id., ¶ 47) and ensure that OMH clinicians have ready access to the medical records of the patients they are caring for and treating (see id., ¶ 48). For this reason, the Office of Information Technology Services, which serves as the State's information technology agency, has classified OMH's EMR System as one of critical importance to the State (NYSCEF Doc No. 124, ¶¶ 6-7; see Engel Aff., ¶ 50).
In the face of these compelling averments from responsible State officials, the Court finds unpersuasive CGI's contention that denying OMH and its clinicians access to patients' electronic medical records would pose nothing more than a mere "inconvenience[]" (Third Titus Aff., ¶ 48). According to CGI, if OMH were enjoined from using CGI's Custom Work during the pendency of the Court of Claims litigation, OMH could instead have its "trained professional[s] . . . manually enter . . . data" into the various now-integrated applications (id., ¶ 52). However, diverting OMH's "trained professional" staff from their regular duties in order to manually enter patient data into all of the various software applications and manually access patient data from all the applications would not only pose a substantial administrative burden on an already heavily-burdened agency, but would also pose a serious risk of harm to patients.
In so finding, the Court recognizes that OMH has made contingency plans for planned or unplanned outages of the EMR System. Nonetheless, it is one thing for patients' electronic medical records to be unavailable for brief periods of planned maintenance or for an occasional unplanned hardware or software failure; it is quite another thing for a court to enter a preliminary injunction restraining a State agency from using critically important software for months or even years while the parties' financial disputes are being adjudicated. The Court therefore declines CGI's invitation to impose a preliminary injunction that is tantamount to judicial ransomware.
Based on the foregoing, the Court concludes that CGI has failed to establish that the [*8]requested preliminary injunction is necessary to avoid imminent and irreparable harm.
C. Balancing of the Equities
Finally, in considering an application for a preliminary injunction, "the court must balance the equities between the parties to determine whether the irreparable harm that a plaintiff would suffer substantially outweighs the injury that the injunctive relief would cause to the defendant" (Xiaokang Xu v Xiaoling Shirley He, 147 AD3d 1223, 1225-1226 [3d Dept 2017] [internal quotation marks and citation omitted]).
The Court finds that the equities tip decidedly against the injunctive relief requested by CGI. In addition to the factors discussed previously—including the risk that denying OMH access to the Custom Work would jeopardize the health and safety of patients—it would be inequitable to prohibit OMH from using a computer system for which it already has paid more than $34 million while the contractor's claims for additional compensation and delay damages are being litigated. Nor do the equities favor preventing OMH from keeping the EMR System in good working order, which necessarily entails giving third-party contractors access to the Software.
Finally, notwithstanding the explanations tendered by CGI (see Third Titus Aff., ¶¶ 23-29; Second Titus Aff., ¶ 6), it remains unclear to the Court why CGI does not have copies of the custom source code in its possession. As the alleged titled owner of the Custom Work, it was incumbent on CGI to take reasonable measures to safeguard its alleged intellectual property. At this juncture, the equities do not favor imposing upon OMH the burden of attempting to segregate the intellectual property that is claimed to be owned solely by CGI from the rest of the Software and other Deliverables (see Engel Aff., ¶¶ 58-60).
CONCLUSION
Accordingly,[FN8]
 it is
ORDERED that CGI's motion for a preliminary injunction is denied in all respects; and it is further
ORDERED that the parties shall appear for a status conference on February 4, 2020 at 11:00 a.m. to discuss, among other things, whether this action should be stayed pending determination of the Court of Claims case.[FN9]

This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, defendants' counsel shall promptly serve notice of entry on all other parties entitled to such notice (see Uniform Rules for Trial Cts [22 NYCRR] § 202.5-b [h] [1], [2]).
Dated: December 31, 2019
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1, 5, 8-10, 74, 76-94, 107-150.



Footnotes

Footnote 1:The third category of software referred to in Section F, open source software and works derived therefrom, is not at issue in the instant motion practice.

Footnote 2:CGI's "Deliverables" are set forth in a Statement of Work that was attached as Exhibit 2 to Appendix D of the Contract (see Contract, p. 26; NYSCEF Doc No. 9 ["SOW"]).

Footnote 3:As used by CGI, the term "artifacts" refers to training materials, user guides, operating instructions, design documentation and technical blueprints, configuration management manuals and similar documentation (see id., ¶ 31).

Footnote 4:To the extent that the custom software "may not be deemed to be a work made for hire, [CGI] agrees and hereby irrevocably assigns to OMH all, right, title and interest in the Custom Work . . . upon payment in full for such Custom Work (or portion thereof)" (id. [emphasis added]).

Footnote 5:The Court recognizes that OMH held back 10% of the amount due for each Deliverable as a "Surety Amount" (Contract, p. 26). However, CGI has not made a clear showing that it is likely to succeed in claiming an entitlement to the withheld surety funds given its failure to progress the Project to the milestone upon which such funds would begin to be disbursed.

Footnote 6:As stated by CGI in its opening brief: The EMR System was "designed, developed and implemented . . . so that [OMH] could better serve its patients statewide and comply with directives from the federal government. No party disputes the innovation, importance or efficacy of the EMR system CGI created" (MOL, p. 1). CGI's contributions include integrations for purposes of "medication dispensing, lab orders, pharmacy inventory, incident reports, allergy alerts and insurance-look-up functionality, among others" (id., p. 7). Moreover, CGI "developed software for at least sixty-six (66) custom reports, many of which are used and run by OMH on a daily, weekly or monthly basis. These reports ensure patient safety, support OMH's compliance with external oversight organizations . . . and allow OMH to correctly submit claims for hundreds of millions of dollars in federal reimbursement each year" (id.). "Without the intellectual property that CGI developed and implemented, the EMR system OMH has been using for two years does not and cannot work" (id.).

Footnote 7:OMH no longer has access to the software it formerly used to manage prescription medications (see id., ¶ 49). 

Footnote 8:The Court has considered the parties' remaining arguments and contentions, but finds them either unavailing and/or unnecessary to reach given the disposition ordered herein.

Footnote 9:In the event that both sides agree that this action should be stayed, the parties may submit an appropriate stipulation in lieu of appearing for the conference.